**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| MICAH BELLAMY, ANTHONY COOK, and MAURICE JONES, as Personal Representative and on behalf of the Estate of Kailyn Jones, individually and on behalf of all other similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOVERNMENT EMPLOYEES INSURANCE COMPANY, a foreign corporation, and GEICO GENERAL INSURANCE COMPANY, a foreign corporation, <br><br> Defendants. | Case No.: 6:17-cv-891-Orl-40KRS |
| ANTHONY LORENTI and ASHLEY BARRETT, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> GEICO INDEMNITY COMPANY, <br><br> Defendant. | Case No.: 6:17-cv-01755-PGB-KRS |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**The Florida Class Should Be Certified.** Both leased and non-leased total loss claimants have valid claims for Defendants' failure to pay mandatory title and tag fees as a component of actual cash value ("ACV") under the policy. Because leased vehicles have an additional claim for failure to pay sales tax, Plaintiffs have moved to certify a Florida class of non-leased vehicles ("owned vehicles"). Defendants' Opposition asserts that Plaintiffs do not have objective criteria for identifying those total loss claims involving owned vehicles. As set out below, this assertion is incorrect. More fundamentally, the record here easily meets ascertainability and Rule 23 requirements without even undertaking this process. That is, because the percentage of leased vehicles among total insureds is so small, the process of identifying leased vehicles presents no ascertainability problem under the applicable case law. Defendants have not disputed that of the 210,386 total loss claims approximately 95% of Florida total loss vehicles were owned, and about 5% were leased. Exh. A, Martin 11/1/18 Decl. at ¶ 8. The 5% leased vehicle claims to be excluded from the class number approximately 10,519.

The supplemental declaration of Defendants' expert Lynn Mitchell indicates that over 6,676 lease claims have already been identified. Ms. Mitchell states: "While the newer produced data fields may contain references to a lease, that additional data was not necessary because 5,932 of these claims previously had lease references." Exh. B, Mitchell 2nd Decl. at ¶ 9(d); *see also id* at ¶ 9(f) (noting "The remaining 744 claims that previously had ambiguous data with respect to leased status in the original produced datasets now have an indication of a lease in the new produced data fields.") Thus, Defendants have *admitted* the class is currently 98.17% ascertained.

This leaves only approximately 1.83% of all claims (i.e., 10,519 - 6,676 = 3,843) remaining to be identified as leases for later exclusion from the class. Plaintiffs submit that 1.83% of claims is considered de minimis under the applicable law, and that, even if Plaintiffs were unable to identify a single additional leased vehicle to exclude from the class, the current record of 98.17%

(or even a record of 95%) accuracy does not presents any ascertainability problem under the law. *See, e.g., In re Nexium Antitrust Litig.*, 777 F.3d 9, 25 (1st Cir. 2015) ("a certified class may include a de minimus number of potentially uninjured parties") (defining de minimis in "functional terms" such that, "if common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect") (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1270 (11th Cir. 2009)); *In re Asocol Antitrust Litig*, 323 F.R.D. 451, 482 (D. Mass. 2017) ("Defendants do not sufficiently show that even 10% of the class constitutes more than a de minimis number sufficient to deny class certification"). Notwithstanding the strength of the current record, Mr. Martin's analysis allows for the manageable identification of all leased vehicle claims through objective criteria.

**The class is ascertainable.** Ascertainability is a non-statutory front-end inquiry related to Rule 23's requirement to provide "the best notice that is practicable under the circumstances" to those "[class] members who can be identified through reasonable effort" at a later date. Fed. R. Civ. P. 23(c)(2)(B). In this case, this Court could simply direct notice to *all* insureds informing them that they are all potential class members, and the best practicable notice requirement is met.

**Defendants Failed to Identify a Single Error by Mr. Martin.** Defendants have access to all of their records, and can electronically search for terms in "claim notes" to identify thousands of leased vehicles. Exh. C. Thompson Dep. at 49; Exh. D, Hall Decl. at ¶¶ 2-11. As Ms. Mitchell has admitted, Defendants can identify leased vehicles by examining the titled owner (Baer Dep. at 27-28; Mitchell Dep. at 72-73); reviewing data fields that identify leases (*Id*. at 77-78); utilizing third party title history reports to verify leases (Mitchell Dep. at 39-40); and reviewing claim notes (Hall Decl. at ¶¶ 5-11). That is, Defendants have access to all the evidence that could show Mr. Martin's methodology failed to accurately identify leased vehicles, yet they have not identified a single error – such as identifying a mistake in the 1100 sample claims, or applying his methodology

to show a false positive – much less a statistically significant number of errors.

Defendants' expert was asked *why* she did not determine whether Mr. Martin had misidentified any leased vehicles. Mitchell Dep. at 79-80. Her response was not that it could not be done or it would be too expensive or time consuming. Instead, her response was that she was not asked to do so. Mitchell Dep. at 79-80; *see also* Mitchell Dep. at 21 (she has "no idea" whether Mr. Martin's leased vehicle determinations are correct). It is noteworthy that after Ms. Mitchell was cross-examined at deposition about her failure to test leased vehicle determinations (even though testing would admittedly be easy), she provided a supplemental declaration (Exh. B) that *still* failed to identify a single misidentified leased vehicle. This record is insufficient to challenge an ascertainability method. Such a challenge must provide specific evidence that the method yields inaccurate results.[1] Defendants provided no such evidence here.

**The Data Includes Undisputed Leased Vehicle Indicators.** There are many inputs in Defendants' data that can be used to identify leased vehicles, including: payments data (e.g., payments on lease accounts or payments identified as payments on leased vehicles or to leasing companies) (examples at Ex. E); salvage information (e.g., salvage special instructions data identifying leased vehicles) (examples at Ex. F); titled owner information (e.g., titled owner data fields identify the owner as a leasing company or that the vehicle is a lease) (examples at Ex. G); endorsement (the UE30A endorsement is used on leased vehicles); and the amount of sales tax

---

[1] *See, e.g., Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 582 (N.D. Ill. 2018) (finding the proposed TPCA class ascertainable over defendants' objections where defendant failed to produce any ***specific evidence*** that the proposed class was overly-broad) (emphasis added); *Del Valle v. Glob. Exch. Vacation Club*, 320 F.R.D. 50, 56 (C.D. Cal. 2017) (finding the proposed TPCA class ascertainable where defendants-maintained data that can be used to determine proposed class members that should be excluded, yet failed to provide ***evidence*** of improperly added class members) (emphasis added); *Grubb v. Green Tree Servicing, LLC*, No. CV 13-07421 (FLW), 2017 WL 3191521, at *17 (D.N.J. July 27, 2017) (finding the proposed FDCPA class ascertainable over defendants' objections when defendant failed to "provide a ***sworn affidavit or declaration***, from a corporate representative who would attest that [d]efendant cannot determine ***from the records*** whether a [potential class member] should be excluded from the class, based on the objective factors proposed in the class definition.") (emphasis added); *Bias v. Wells Fargo & Co.*, 312 F.R.D. 528, 539 (N.D. Cal. 2015) (holding the proposed RICO class ascertainable where defendant ***has the data to refute*** plaintiff's methodology, but fails to do so; defendant's records identify class members but defendant failed to provide any ***specific evidence*** that the proposed class was overly-broad) (emphasis added).

paid on claims. Defendants do not dispute that the above data sources indicate leased vehicles.

**Payment Information.** Without identifying a single erroneous class member determination, Defendants claim Mr. Martin's methodology is flawed as to Scenario I, Step 1, because the highest payment of an owned (not leased) vehicle may be a person or a corporation (lienholder or business). Defendants ignore the purpose of this step: to identify data that strongly indicates a vehicle is *not a lease*. This step identifies certain vehicles that should not be a lease; this step does not, of course, purport to identify all vehicle leases. *Id.*

**Titled Owner Information.** Defendants claim that Mr. Martin should not use "Titled Owner" information in Scenario I, Step 2, because titled owner data is not available for every claim, and because titled owner data sometimes provides information about the title or when the title will be provided (rather than the titled owner). However, a review of the actual titled owner data shows that it frequently identifies leased vehicles (in the form of titled leasing company or a notation that the vehicle is a lease). Exh. G. Even Ms. Mitchell agreed that titled owner data, when available, correctly identifies leased vehicles. Mitchell Dep. at 72-74. As with all leased vehicle indicators, titled owner need not be universally applied for it to be utilized as a lease indicator for those claims where titled owner information *is* available.

**UE30A Endorsement.** Defendants assert (inaccurately) that Mr. Martin erroneously claims that UE30A endorsement data identifies all leased vehicles. Plaintiffs readily admit that UE30A is only one leased vehicle indicator, and Mr. Martin's declaration is clear that he does not rely on any single data input to identify conclusively that a vehicle is a lease. Scenarios I and II use multiple lease indicators to reliably identify leased vehicles. For the sake of completeness, Plaintiffs also state they learned in a November 27, 2018 GEICO deposition that UE30A data in the late-produced spreadsheet SLGEICO05726 provided dates that sometimes indicate an

endorsement cancellation rather than an effective date. Hall Decl. at ¶¶ 17-22. Reliance on this data therefore no longer applies to Scenario 1, but remains a check under Scenario 2. *Id.*

**Third Party Title Reports.** Defendants object to Plaintiffs' review of third party title reports as a check on leased vehicle status. However, Defendants' expert expressly testified that using title history reports is an acceptable method of checking leased vehicle determinations. Mitchell Dep. at 40-41, 72-73.

**Plaintiffs Have Identified A Manageable Process for Identifying Class Members.** Plaintiffs have completed the analysis for 61,873 total loss claims the case. Hall Decl. at ¶ 12. From those claims, Plaintiffs have identified 58,439 persons with non-leased vehicles (94.4%), and 3,434 (5.6%) are persons with leased vehicles. The process works. Plaintiffs can complete the full analysis of the approximately 210,000 within roughly 21 days. Hall Decl. at 12.

**Claim Notes Confirm An Effective Methodology.** Plaintiffs also have reviewed claim notes late-produced by Defendants on 11/29/18 and 12/10/18. Claim notes show the diary entries by various claims adjusters and salvage representatives, and these notes almost always identify whether a vehicle is leased (because the lease status affects which entity must release the title, and how much in sales tax is paid). Exh. C to Hall Decl. (sample claim notes). Reviewing these sample claim notes enabled Plaintiffs to test their methodology on the 300 sample claims. Claim notes allow Defendants to test Plaintiffs' methodology on thousands of claims if they wished to do so.

Plaintiffs reviewed the claim notes of these 300 claims and compared them to Mr. Martin's leased vehicle determinations using his methodology. Hall Decl. at ¶ 5. None of the claim notes showed any leased vehicle identification for any one of the 283 total loss claims that Mr. Martin's methodology identified as *not* a lease. Plaintiffs confirmed from claim notes the leased vehicle status of 16 of his 17 lease vehicle determinations. Hall Decl. at ¶ 7.

Defendants can electronically search their claim notes on a mass (batch) basis and identify

5

thousands of likely leased vehicles. For example, the term "lease veh" (with the root "veh" for vehicle) is a term that often identifies leased vehicles in the claim notes. *See* Hall Decl. at ¶¶ 5-11. Defendants can search such terms and print a report with each and every claim that includes them. Defendants can quickly and easily compare those search results to Mr. Martin's determinations. Defendants have not done this. *See* Case Cites at fn 1, *supra*. Of course, even after class certification is granted, Plaintiffs are happy to cooperate with Defendants if they wish to review any of Mr. Martin's determinations, and will exclude any additionally identified leases.

**Both Injury and Damages Are Uniform Across the Class.** Defendants object to calculating damages of $75.25 for title transfer fee and $4.50 for registration (or tag) transfer fee, which are the minimum transfer fee payments to replace a vehicle, because such amounts, according to Defendants, may be less than the *actual* amounts that Plaintiffs and other class members actually *incurred*. This is a merits argument that will be addressed at summary judgment.

The $75.25 mandatory title transfer fees are the same for each and every vehicle purchase. *See* Def.'s Resp. Ex. U at 2 (Doc. 129-22 at page 2 of 6) ($75.25 fee for transfer of title (no lien)). This fee includes $21 for State Transportation Trust Fund, $1 for Highway Safety Operating Trust Fund (odometer fee); $48 for General Revenue, $1 for Security; and a $ 4.25 service fee. *Id.* The $4.50 tag fee also is the same for everyone and includes $1.00 for air pollution control, $2.50 for registration service, and a $1.00 decal fee. (Defendants incorrectly claim Plaintiff Micah Bellamy did not pay a registration transfer fee. However, Mr. Bellamy did pay a registration fee of (at minimum) $4.50. And Mr. Bellamy's car dealer imposed a fee of $8.00. Hall Decl. at ¶ 23.

If any individual insured paid *more* than $75.25 or $4.50 for the respective fees, they were paying additional and *different* fees that are not *mandatory* fees in the replacement of *any* total loss vehicle. *Id.* Consequently, those non-mandatory and non-universal fees are not due under Defendants' policy promising payment of ACV (defined as the cost of replacement). Such á la

6

carte fees on title transfer include fees for choosing to have a paper title printed and mailed ($2.50), a lien recordation ($2.00), or purchasing a vehicle qualifying for a Lemon law fee ($2.00).

The $75.25 title transfer and $4.25 tag fee damages are uniform across the class. Plaintiffs will show at the merits stage that these damages amounts are the statewide minimum fees applied to the transfer of all vehicles. *See Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1234 (11th Cir. 2016) (courts should consider the merits only to extent necessary to conduct Rule 23 analysis).

**ACV Damages Calculation.** Defendants argue that transfer fee amounts calculated by car dealers may be higher than the amounts actually owed to the state (and thus owed under the policy). Dealers often combine charges, and Plaintiffs believe this "dealer overcharge" claim is irrelevant (and, in the car industry, is often reimbursed to the extent of the overcharge). If a car dealer overcharges an insured relative to mandatory fees, that has no bearing on what the policy requires.

**Salvage Retention Is Irrelevant.** Defendants assert that some insureds retain their salvage, and thus have different title fees. But for any salvage vehicle to be operated (and used as a true replacement), the vehicle must receive a rebuilt title, which will cost a minimum of $75.25. *See* DE 129-22 at 4, Exh. U. Defendants suggest that whether an insured actually replaces a vehicle is relevant, but it is not. Mot. at 10. An insurer could write a policy that expressly conditions coverage on actual replacement, but Defendants did not do so here. Instead, the policy requires payment of a recognized value (i.e., replacement costs) whether the insured decides to use that insurance settlement payment to buy a replacement vehicle or puts the money in his or her bank account.

**Deducting Any Paid Fees Is A Simple Damages Calculation.** It is undisputed that it is Defendants' practice and procedure to not pay title and license plate transfer fees. Defendants claim, however, that sometimes such fees are paid anyway, yet they identify only *one* claim for which they paid a title fee: the claim where Defendants paid $29.25 of the $75.25 fee. Because Defendants paid less than the $75.25 fee minimum, the single claim identified by Defendants

presents a simple damages calculation for set off (not a hurdle to class certification). Defendants maintain data sets that expressly identify title transfer and regulatory fees that were paid on all claims. Data produced by Defendants show a title or tag payment on only 160 claims out of approximately 210,000 claims. Hall Decl. at ¶¶ 13-16 (describing payments data word search). This amounts to less than one claim out of 1,000.

### Eight State "Multi-State" Class Should Be Certified

Through additional discovery (including supplemental interrogatory responses and a Rule 30(b)(6) deposition on nationwide class issues), Plaintiffs have identified eight states in addition to Florida where class certification is appropriate: CT, IN, ME, NH, NJ,[2] NY, VT, and WY.

**Common Issues Predominate, and the Class Representatives' Claims Are Typical.** The central issue to be determined is whether title and tag fees are due based upon the definition of actual cash value ("ACV") in GEICO's uniform insurance policy with its insureds. The policy language for seven of these eight states have identical definitions of ACV: "[T]he replacement cost of the auto or property less deprecation." Exh. H, Def.'s Am. Resp. to First RPDs. The Maine policy provides that "ACV is the replacement cost of the auto or property less depreciation and/or betterment," and Defendants agree this definition is considered the same as the above language. *Id.* Defendants also admit that the relevant portion of the policies which relates to the payment of ACV is materially the same in all eight states. Exh. I, Dep. of Troy Penry at 16-17, 191-192, 193-194. Moreover, Defendants have a uniform practice and policy of not paying title fees in each of these eight states, due to their erroneous interpretation of the policy definitions of ACV. Penry Dep. at 132, 140-141, 145-146, 147-148, 149-151, 157-160, 166-169.

None of these eight states has any unique state law statute or regulation requiring or

---

[2] Defendants point to another class action in New Jersey in a footnote, but the instant case was filed before that matter, and under the "first filed doctrine," Defendants should therefore move to transfer or dismiss the other, second-filed matter. *In re Checking Account Overdraft Litig.,* 859 F. Supp. 2d 1313, 1314 (S.D. Fla. 2012).

precluding payment of title and tag fees as part of ACV. Regardless, state law simply sets a floor for minimum coverage. Parties can contract for additional coverage above that floor, and in such circumstances (as here) the policy language controls. Plaintiffs have previously set forth the law for breach of contract in each of the eight states, and it is materially identical. [DE 99-18, exhibit R.] For each of these states, summary judgment will be presented to the Court showing (1) the materially identical terms of controlling contract; and (2) the statutory title transfer and tag fee requirements applicable to all vehicles. Issue No. 1 should involve the same breach of contract analysis for each state. Issue No. 2 is a simple question of law: what amount is required to be paid.[3]

The Eleventh Circuit's precedent in *Allapattah Services, Inc. v. Exxon Corp.,* 333 F.3d 1248 (11th Circ. 2003), is on point. The application of multiple states' laws is not a bar to certification of a multi-state class where the general policies underlying common law contract construction tend to be uniform. *Id.*; *see also Kleiner v. First National Bank,* 97 F.R.D. 683, 691 (N.D. Ga. 1983). Differences in the language of the form of the contract do not preclude class treatment, nor does the application of various state laws, where the general policies underlying common law rules of contract interpretation tend to be uniform. *Id.* at 694.

**Plaintiffs Have Standing.** Plaintiffs have Article III standing because they suffered total losses and were covered by policies with identical material terms as other total loss claimants in each of the eight states. Plaintiffs have the same interest and suffered the same injury (i.e., breach of that policy) as the class members in each of the eight states. *Carter v. Forjas,* 701 Fed. Appx. 759 (11th Cir. 2017) (rejecting challenge to standing of single class representative in nationwide class and approving settlement).

**Personal Jurisdiction.** Defendants have waived any personal jurisdiction defense by

---

[3] Regarding these amounts, Defendants have admitted they have uniform practices, including centralized storage and management of total loss claims data, across all of the eight states. Defendants maintain claim numbers, date of loss, and detailed payments data for all total losses in all 50 states. Exh. J, Thompson 2nd Dep. at 5-7, 52-55. This data is easily accessible to Defendants.

9

failing to raise it in Defendants' first responsive motion or pleading, and failing to otherwise preserve it in their answer. Fed. R. Civ. P. 12(b). Regardless, although Defendants failed to cite it, this Court has recently held that *Bristol-Myers Squibb Co. v. Superior Ct. of Cal. San Franscisco Cty*, 137 S. Ct. 1773 (2017), does not apply in a federal class action like this. *Brotz v. Simm Assocs,* 2018 U.S. Dist. LEXIS 176612 (M.D. Fla. 2018). A majority of federal courts in Florida to have considered this question have agreed.[4]

Court have broad discretion to redefine classes, *see A & M Gerber Chiropractic LLC v. Geico Gen. Ins. Co,* 321 F.R.D. 688, 695 (S.D. Fla. 2017), and a plaintiff may narrow its class definition, *see In re Disposable Contact Lens Antitrust*, 2018 U.S. Dist. Lexis 212329 (M.D. Fla. 2018). In light of Defendants' supplemental discovery responses and Rule 30(b)(6) deposition testimony, Plaintiffs' propose the following multi-state class definition:

> Residents of the states of Connecticut, Indiana, Maine, New Hampshire, New Jersey, New York, Vermont, and Wyoming insured for PPA physical damage coverage by Government Employees Insurance Company, GEICO General Insurance Company, and GEICO Indemnity Company who suffered a first-party loss of a covered vehicle at any time during the applicable statute of limitations in each state through the date of class certification, whose claims were adjusted by a Defendant as a total loss claim, whose claims resulted in payment by a Defendant of a covered claim, and who were not paid title and tag fees mandated on the purchase of a private passenger auto.[5]

Dated: January 2, 2019

/s/ Bradley W. Pratt
Bradley W. Pratt
Florida Bar No. 0094300
**Pratt Clay, LLC**
4401 Northside Parkway, NW
Suite 520
Atlanta, GA 30327
Telephone: (404) 949-8118

---

[4] *See also* e.g., *Becker v. HBN Media, Inc.*, 314 F. Supp. 3d 1342, 2018 WL 3007922 (S.D. Fla. 2018); *Tickling Keys, Inc. v. Transamerica Fin. Advisors, Inc.*, 305 F. Supp. 3d 1342, 2018 WL 1701994 (M.D. Fla. 2018).

[5] Courts in this district have approved the limitation of "within the applicable statute of limitations" as a sufficient definition of time in multi-state breach of contract class actions. *See, e.g., Herman v. Seaworld Parks & Entm't*, 320 F.R.D. 271 (M.D. Fla. 2017). The case *Oginski v. Paragon Props. Of Costa Rica*, LLC, 282 F.R.D. 627, 677 (S.D. Fla. 2012) contains no reference to a statute of limitations.

Facsimile: (404) 949-8159
bradley@prattclay.com

Tracy L. Markham
**Avolio & Hanlon, P.C.**
2800 N 5th Street, Suite 302
St. Augustine, Florida 32084
Phone: (904) 794 7005
Facsimile: (904) 794 7007
tlmarkhamlaw@gmail.com

Christopher Hall
**Hall & Lampros, LLP**
1230 Peachtree St. NE
Suite 950
Atlanta, Georgia 30309
Telephone: (404) 876-8100
alampros@hallandlampros.com

/s/Jacob L. Phillips\_\_\_\_
Edmund A. Normand
Jacob L. Phillips
**Normand PLLC**
P.O. Box 140036
Orlando, FL 32814
Telephone: (407) 603-6031
Facsimile: (509) 267-6468
Ed@EdNormand.com
jacob@ednormand.com

Christopher J. Lynch
**Christopher J. Lynch, P.A.**
6915 Red Road, Suite 208
Coral Gables, Florida 33143
Telephone: (305) 443-6200
Facsimile: (305) 443-6204
clynch@hunterlynchlaw.com
lmartinez@hunterlynchaw.com
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

      A copy of the foregoing was served electronically upon counsel for all parties via the court's CM/ECF system on this 2nd day of January, 2019.

| | |
|---|---|
| Amelia Toy Rudolph<br>Florida Bar No. 57015<br>999 Peachtree Street, N.E.<br>Suite 2300<br>Atlanta, Georgia 30309<br>Tel: (404) 853-8000<br>Fax: (404) 853-8806<br>amelia.rudolph@sutherland.com<br>***Attorney for Defendants*** | Kymberly Kochis (*pro hac vice*)<br>Alexander Fuchs (*pro hac vice*)<br>Sutherland Asbill & Brennan LLP<br>The Grace Building, 40th Floor<br>1114 Avenue of the Americas<br>New York, NY 10036<br>Telephone: (212) 389-5068<br>Facsimile: (212) 389-5099<br>kymberly.kochis@sutherland.com<br>alex.fuchs@sutherland.com<br>***Attorneys for Defendants*** |
| Susan B. Harwood<br>Florida Bar No. 375667<br>KAPLAN ZEENA LLP<br>2 South Biscayne Boulevard<br>One Biscayne Tower<br>Suite 3050<br>Miami, FL 33131<br>Email: Susan.Harwood@kaplanzeena.com<br>***Attorney for Defendants*** | |

                                            */s/ Bradley Pratt*